STANDARD SCALE & SUPPLY CO. v. CROPP CONCRETE MACHINERY CO. et al.

CROPP CONCRETE MACHINERY CO. et al. v. STANDARD SCALE & SUPPLY CO.

(Circuit Court of Appeals, Seventh Circuit. January 7, 1919. Rehearing Denied March 4, 1919.)

Nos. 2526, 2527.

1. PATENTS �köö155—EFFECT OF DISCLAIMER.
     A claimant of a generic invention does not lose his right by declining to claim some other person's subsequently devised form.

2. PATENTS �köö328—INFRINGEMENT.
     Cropp patent, No. 947,196, dated January 18, 1910, claims 1, 2, 3, 4, 7, 9, 12, 13, 14, and 16, for a concrete mixer, *held* valid and infringed; patents

�kööFor other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

to Ransome, No. 322,006, No. 804,803, and No. 870,797, to Burns, No. 661,487, and to Roberts No. 845,435, not being pertinent.

Appeals from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Proceedings between the Standard Scale & Supply Company and the Cropp Concrete Machinery Company and Andrew J. Cropp concerning patent rights. There was a decree in favor of the former as to one claim, and in favor of the latter as to other claims, and they both appeal. Decree in favor of the former reversed, and that in favor of the latter affirmed.

George L. Wilkinson and Percival H. Truman, both of Chicago, Ill., for appellant.

Franklin M. Warden, of Chicago, Ill., for appellee.

Before BAKER and EVANS, Circuit Judges.

BAKER, Circuit Judge. Cropp Company and Cropp obtained a decree that claims 1, 2, 3, 4, 7, 12, 13, 14, and 16 of patent No. 947,196, January 18, 1910, to the company as assignee of Cropp, for a concrete mixer, were valid and infringed by the Standard Company's machine. No. 2526 is the Standard Company's appeal from that finding. In the same suit a complaint based on claim 9 was dismissed on the ground of noninfringement, and the appeal in No. 2527 assails that ruling.

Claim 9, which relates to the charging means, reads as follows:

"9. The rotary mixing receptacle having at its receiving end a charging device consisting of a centrally apertured disk secured to the receptacle, and a series of blades extended at their outer ends from the disk inwardly and diagonally with respect to the receptacle for a short distance from the disk for the purpose of directing the material into the receptacle, said blades having their portions adjacent to the disk of substantially the same width as said disk from the opening therein to its periphery and their inner portions widened."

Portable machines, of rotary drum type, for mixing batches of concrete, are used in situ in various building operations. In prior machines the opening at the receiving end was so high from the ground that the workmen in bringing the materials had to wheel their barrows up a staging. In the structure of claim 9 this difficulty is obviated by reason of the large size of the aperture in the disk; and at the same time the mixing capacity of the rotary drum is preserved by the action of the peculiarly formed and arranged diagonal blades. Utility is manifest. Nothing in the prior art gives any hint of the idea embodied in claim 9. Invalidity is predicated solely upon Patent Office proceedings which resulted in Cropp's inserting the following disclaimer in his application:

"I hereby disclaim the following claim, to wit: In a mixer, in combination, a revoluble drum, means therein to agitate and mix the material, a continuous series of circularly arranged charging pockets located at one end of the drum within its cylindrical wall and closed at their outer ends, the open inlets of the pockets being turned toward the axis of the drum, a circular head having its periphery contacting with the tops of the pocket walls and set in from the adjacent end of the drum, and means to introduce material to the inlets of the pockets outside of said head."

[1] In Reed v. Cropp Concrete Machinery Co., 239 Fed. 869, 152 C. C. A. 653, the history of the three-cornered interference between Cropp, Reed, and Sanborn and the relation of the disclaimer to Cropp's claim 9 were fully considered. Though the decree in that case may not be res adjudicata, we find no reason in the present record for hesitating to say stare decisis. Cropp's application described two forms of the "low-charging" structure. His claim 9 was aptly worded to cover the genus exemplified by his two forms. Later Sanborn disclosed another form and claimed it in the words subsequently copied by Cropp in his disclaimer. When Cropp was invited to interfere, he replied that he was not the inventor of the Sanborn species. Manifestly neither Cropp nor the Patent Office understood that he was thereby confessing that he was not the inventor of the genus, for otherwise Cropp would not have continued to prosecute, and the Patent Office would not have allowed, claim 9. Indeed, the Standard Company does not seriously dispute the legal principle involved in the Reed case, namely, that a claimant of a generic invention does not lose his right by declining to claim some other person's subsequently devised form.

Nevertheless it was open to the Standard Company to defend on the ground that Sanborn or Reed had been the first to devise any form of "low-charging" mixer, and that Cropp consequently was not entitled to hold his generic claim. In the Reed Case, the burden of proving priority was on Cropp; here it is on the Standard Company. Though there is some additional testimony, it relates in the main to the development of the second form described in Cropp's application. Respecting Cropp's creation of the first form, and therefore of the genus, the evidence which led us before to an affirmative finding in Cropp's favor is now considered sufficient to repel the Standard Company's attack upon the prima facie validity of the claim.

In the claim the charging blades are described as "having their portions adjacent to the disk of substantially the same width as said disk from the opening therein to its periphery." In the Standard Company's machine the outer portions of the charging blades are of slightly less width than the "disk from the opening therein to its periphery." But the proofs leave it sufficiently clear that the Standard Company obtains the full result of Cropp's "low-charging" machine by charging blades formed, arranged, and operating according to the principle disclosed by Cropp. The proven departure was therefore not sufficiently "substantial."

Claim 13 is a fair statement of Cropp's invention of discharging means:

"13. The rotary mixing receptacle having an opening in its discharging end, a chute located in said opening and extended into the receptacle, a door pivotally mounted within the receptacle and adapted to open and close the chute and to assist in guiding the material thereto, a plate secured to the receptacle at its discharging end and extended radially thereinto within the path of the door, and another plate diagonally disposed from the last-named plate partially across the inner surface of the receptacle."

Through an opening at the discharging end a chute extends into the drum. This chute is rigidly secured to and revolves with the drum.

During the mixing process a door, pivotally mounted within the drum, covers the opening of the chute. This door-covered chute and the two plates mentioned in the claim assist in the mixing process. When it is desired to discharge the mixture, the door is thrown open by means of a lever outside the drum, and the door then bears against the radial plate. A flange along the inner edge of the door co-operates with the door, the radial plate and the diagonal plate in guiding the material into the chute. These parts obviously may be, and in practice are, so related to the capacity of the drum and the capacity of a barrow that at each revolution one barrow load is discharged, and so the workmen in file wheel away the mixed batch.

In the prior art we find nothing that denies the patentable novelty of this combination of means. Patents to Ransome, No. 322,006, No. 804,803, and No. 870,797, to Burns, No. 661,487, and to Roberts, No. 845,435, are not pertinent, because the discharge spouts are not attached to and do not revolve with the drum. McKelvey's patent, No. 751,541, is for a rotary feeding device for concrete mixers. This contains a chute which is rigidly attached to and revolves with the drum of the feeder and extends from the interior of that drum into the "high-charging" opening of a mixing drum of the prior art. The mouth of the chute is the full width of the feeder. Along one edge of the chute within the feeder a door is pivotally mounted. This door is rectangular in shape, and extends axially from side to side of the feeder and radially from its hinge to the periphery of the feeder. While the concrete materials are being dumped into the "low-charging" opening of the revolving feeder, the door is held over the mouth of the chute by means of a lever that extends outside the feeder. When the materials are to be fed into the mixer, the door is thrown open till it bears against lugs on the interior of the feeder's periphery. As the feeder revolves, the door lifts and throws the materials into the chute and thence into the mixer. McKelvey's feeder, as he suggests, could itself be used as a mixer by providing it with the customary mixing plows and blades. Granting full weight to the Standard Company's assertion that McKelvey, therefore, shows a concrete mixer embodying a combination of a revolving drum, a chute attached to and revolving with the drum, and a door pivotally mounted within the drum, and adapted to open and close the chute and to guide the material into the chute, we agree with the trial judge that the McKelvey disclosure does not forestall the Cropp concept. Cropp's claims, read in the light of his description and drawings, call for a chute that extends but a little way into the drum, and is so associated with the door, the flange, the radial plate, and the diagonal plate that the combination constituting the discharging means does not impede or interfere with the charging and mixing means at the other end of the drum, but, on the contrary, co-operates in the final stages of the mixing, does not form a dam across the stream, but only a wing dam, and does not lift up and expel the entire contents at a single throw, but is so proportioned to the capacity of the drum that only a predetermined fraction is discharged in one revolution; and inasmuch as the conception of this result and of the mechanical combination to produce it is not found in the prior

art, there is no basis for rejecting the Patent Office's attribution of this achievement to the creative imagination of an inventor.

[2] The question of infringement is really narrowed to claim 1. In Cropp's drawings and description, and in his commercial structure, the chute is segmental in cross section and is tapered inwardly; the door has its free end cut to match the taper of the chute; and the radial plate is tapered to correspond with the tapered end of the door. Claim 1 calls for the tapered chute and door. In the Standard Company's machine the chute is tapered, but the door is rectangular and more than covers the mouth of the chute. With the use of a rectangular door a large part of the radial stop plate may be and is dispensed with; and the flange along the inner edge of the door has been taken off and fastened to the edge of the chute. When the Standard Company's door is shut, all the Cropp functions are performed. When it is opened, the superfluous metal of the rectangular door does service for the omitted portion of the radial stop plate; the diagonal plate performs its regular office; the flange operates in the same way; and all together, the chute, door, flange, stop plate, and diagonal plate constitute a wing dam, that divides, directs, and discharges the mixture in substantially the same way as does Cropp's wing dam. Even claim 1 is entitled to .a range of equivalency that embraces such colorable changes.

In No. 2526 the decree is affirmed; in No. 2527, the decree is reversed, with the direction to enter a decree for an injunction and an accounting with respect to claim 9.